## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

GENERAL DYNAMICS ELECTRIC )
BOAT CORP., )
                               )
                 Plaintiff, )       Case No.
     v. )
                                 )
MICKEY SKOBIC; JOANNE SKOBIC, )     **JURY TRIAL DEMANDED**
                                 )
                 Defendants. )
                                 )

## COMPLAINT

Plaintiff General Dynamics Electric Boat Corp. ("Electric Boat") brings this action against Mickey Skobic and Joanne Skobic for fraud/fraudulent concealment, civil conspiracy to commit fraud, aiding and abetting fraud, violations and civil conspiracy in violation of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962, 1964, and the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Ann. §§ 772.103–104, and tortious interference and civil conspiracy to commit tortious interference.

### INTRODUCTION

1.      The nuclear submarines Electric Boat builds for the United States Navy consist of 1.7 million parts from 2,100 suppliers. Nuflo, Inc. ("Nuflo") was one of those suppliers and provided pipe fittings and similar parts. Electric Boat sometimes purchased Nuflo parts from another corporation, Synergy Flow Systems ("SFS").

Electric Boat has discovered that some parts it purchased from Nuflo and SFS contained undocumented and unauthorized weld-repairs that normal inspections could not detect.  When Electric Boat made this discovery, it had to dedicate tens of thousands of labor hours to locating and re-testing many thousands of Nuflo parts to identify nonconformances and to determine, with the Navy, whether the parts could still be used for their intended purpose.  Due to the sheer quantity of parts to be re-tested, Electric Boat had to hire an additional workforce of full-time inspectors, who had to use costly, specialized tests to search for and identify otherwise invisible and undocumented weld-repairs.

2.     Electric Boat brings this suit because Defendants Mickey and Joanne Skobic ("the Skobics") admitted in a False Claims Act ("FCA") complaint that these undocumented and unauthorized weld-repairs were in fact part of a years-long fraud against Electric Boat.  Am. Compl., *United States ex Rel. 84Partners LLC v. Gen. Dynamics Electric Boat*, No. 3:14-CV-1256-TJC-PDB, Dkt. No. 52 (M.D. Fla. Jan. 31, 2020) ("FCA Amended Complaint" or "FCA Am. Compl.") (Ex. 1); Second Am. Compl., Dkt. No. 102 (FCA Second Amended Complaint or "FCA SAC") (Ex. 2). The FCA Amended Complaint and FCA Second Amended Complaint are collectively referred to as "FCA Amended Complaints." The Skobics worked for Nuflo in Jacksonville, Florida.  Mickey Skobic was a welder and inspector; Joanne

Skobic held various positions and, the Skobics allege, acted as an uncertified inspector.

3.      Although the FCA Amended Complaints have been dismissed, and that dismissal has been upheld on appeal, Electric Boat cannot let fraud of this nature in its supply chain go unaddressed.  Failing to hold the Skobics accountable for their behavior would undermine the strict quality assurance programs in nuclear submarine manufacturing that are necessary to provide the Navy and its sailors with safe ships that will meet their intended missions.

4.      Beginning in 2005, Mickey Skobic's associates at Nuflo and SFS asked him to perform repair welds he knew were "illegal[]" and rendered parts nonconforming to the specifications established by the Navy and by Electric Boat via its purchase orders.  FCA Am. Compl. ¶ 115; FCA SAC ¶ 226.  Mickey Skobic agreed to help conduct the scheme and—per the Skobics' FCA Amended Complaints—to operate Nuflo as a criminal enterprise.  He agreed to weld-repair the parts, worked to "machin[e]" the parts "to disguise the[]" unlawful repairs, falsified records and failed to disclose the repairs, and worked with associates at Nuflo and SFS to deliver nonconforming parts to Electric Boat.  FCA Am. Compl. ¶ 101; FCA SAC ¶ 212.  Mickey Skobic engaged in many instances of improper, unauthorized,

and nonconforming weld-repairs through October 2013.  FCA Am. Compl. ¶¶ 48, 108, 115; FCA SAC ¶¶ 224, 226.[1]

5.     Joanne Skobic—in addition to knowing about Mickey Skobic's improper repair welds—herself participated in the fraudulent scheme through the inspections she performed.  The Skobics' scheme also involved "falsified heat treat numbers," "failure to perform required inspection and testing," and use of "unqualified personnel," "improper inspections," and "fraudulently-certified inspectors."  FCA Am. Compl. ¶¶ 13, 95, 125; FCA SAC ¶¶ 107, 210, 239–40, 252. Joanne Skobic was one of the individuals who performed "various quality inspections" "although not properly certified" to do so, including "verification of material composition, heat treatment, and critical dimensional checks."  FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.

6.     The Skobics and their associates at Nuflo and SFS "regularly and intentionally falsified records purporting to show that parts were properly manufactured, assembled, inspected and tested when they were not."  FCA Am.

---

[1] Electric Boat does not have personal knowledge of certain allegations in this First Amended Complaint and relies on the Skobics' own allegations and admissions in the FCA Amended Complaints.  For example, Electric Boat does not have personal knowledge that Mickey Skobic weld-repaired the number of parts that the Skobics allege (given the Skobics' allegation that the repairs were disguised and undocumented); that all such repairs were unauthorized or improper (given that weld-repair is permissible on some parts in some circumstances); or that particular unauthorized or improper repairs reflected an intentional fraud (rather than errors).  But the Skobics have admitted in a federal court pleading that they engaged in what they have described as an intentional fraud and conspiracy that resulted in millions of dollars of damages to Electric Boat.

Compl. ¶ 92; *see* FCA SAC ¶ 211.  In some cases, Mickey and Joanne Skobic themselves completed fraudulent certifications by signing or initialing inspection reports certifying parts without disclosing nonconformances they knew existed.  *See* FCA Am. Compl. ¶ 13; *see* FCA SAC ¶ 20.  In other cases, the Skobics knew their associates were falsely certifying parts to Electric Boat as conforming despite knowing the parts were not conforming.

7.     The result of these false certifications, as the Skobics both understood and have themselves admitted, was the delivery of parts to Electric Boat that were "in violation of . . . contractual specifications" yet were not disclosed as such to Electric Boat.  FCA Am. Compl ¶ 116; *see* FCA SAC ¶¶ 234–35.

8.     The Skobics each had a duty to promptly report the misconduct they allege occurred to Electric Boat, the Navy, or law enforcement.  Electric Boat requires its suppliers and their employees to report any fraud, falsification, or malpractice they suspect, and it requires suppliers to tell employees of this duty and post visible reminders of this duty.  Here, the Skobics have admitted that Mickey Skobic knew in 2005 that the conduct he was asked to undertake was "illegal[]" and he began keeping a personal journal documenting his improper weld-repairs.  FCA Am. Compl. ¶¶ 100, 108, 115, 206; FCA SAC ¶¶ 24, 205, 210, 224, 226.  Joanne Skobic also knew during her employment that the conduct in which she participated was unlawful.

9.     The Skobics, however, did not report this wrongful conduct, as required.  Instead, they kept the misconduct and the journal secret for their own personal purposes, compromising the integrity of the supply chain for nuclear submarines and putting the lives of sailors at risk.  Electric Boat, therefore, brings claims against the Skobics to redress the losses it has suffered as a result of the Skobics' conduct and to deter similar wrongful conduct from recurring.  Electric Boat's claims against the Skobics are predicated solely on the damages it has suffered from the Skobics' wrongful conduct.

## PARTIES

10.     Plaintiff Electric Boat is a Delaware corporation with its principal place of business in Groton, Connecticut.

11.     Defendant Mickey Skobic is a Florida resident who, from 2005 to October 2014, worked as a welder and testing inspector for Nuflo.  *See* FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.

12.     Defendant Joanne Skobic is also a Florida resident and worked for Nuflo from April 2008 to October 2015.  *See* FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.

13.     Joanne Skobic had various responsibilities at Nuflo, including cleaning and lubricating pipe, operating grinders to deburr pipe, working in the shipping

department and staffing the tool room.  She also conducted inspections.  *See* FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.

14.    Mickey and Joanne Skobic are married.

15.    Mickey and Joanne Skobic are both members of 84Partners LLC, which was incorporated in Delaware on October 3, 2014.  On November 10, 2014, 84Partners LLC filed a False Claims Act complaint naming Nuflo, SFS, Electric Boat, and NNS as defendants.

16.    Although the FCA Amended Complaints were filed by 84Partners LLC, they identify the Skobics as the sole named members of 84Partners LLC and the Skobics as the source of many of the complaints' allegations.  *See* FCA Am. Compl. ¶¶ 13, 115, 206–42; FCA SAC ¶¶ 20, 205, 224, 226, 303; *id.*, App'x A at A5, A6, A11.  84Partners LLC is an alter ego of, and functions as a façade for, the Skobics, who control and hold the beneficial financial interests in 84Partners LLC. No other individual is able to control 84Partners LLC, and the same counsel represent both the Skobics and 84Partners LLC.  Even the Skobics themselves admitted they "formed [the 84Partners LLC] partnership" only after conveying their personal knowledge to the United States in order to bring "a *qui tam* case against Nuflo, [Electric Boat], and NNS."  Skobics' Mot. to Dismiss at 2, *Gen. Dynamics Electric Boat Corp. v. Skobic*, No. 3:20-cv-00769-TJC-MCR, Dkt. No. 19 (M.D. Fla. Sept. 29, 2020).  Because the Skobics caused the complaints in the FCA case to

be filed and asserted that those complaints reflect their personal knowledge, the allegations in those complaints are admissions of the Skobics.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over the subject matter of Count V in this action, for civil violations of the federal RICO Act, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining counts in this action, as each of those counts derives from a common nucleus of operative fact with Count V.

18.    Independently, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 over the subject matter of all counts because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Electric Boat and both Mickey and Joanne Skobic.

19.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2) and under 18 U.S.C. § 1965(a) because Mickey and Joanne Skobic reside in this district and are both residents of the state of Florida, FCA Am. Compl. ¶ 13, and because events giving rise to Electric Boat's claims occurred in this district.

## PROCEDURAL HISTORY

20.    In late 2014, the Skobics initiated, via a shell corporation, the above-mentioned FCA litigation against Nuflo, Electric Boat, and another shipbuilder, Newport News Shipbuilding (or "NNS").    Compl., *84Partners*, Dkt. No. 3

("Original FCA Complaint" or "Orig. FCA Compl.") (Ex. 3).  The Original FCA Complaint alleged, among other things, that Electric Boat and NNS had violated the FCA by not detecting the Skobics' misconduct earlier.  The complaint, however, remained sealed until August 1, 2019, and it did not disclose the Skobics' identities or their role in the misconduct.  Only when the Skobics filed the FCA Amended Complaint on January 31, 2020, did they reveal their intentional fraud and misconduct to Electric Boat.  On March 16, 2020, Electric Boat filed a motion to dismiss the FCA Amended Complaint in its entirety.

21.     On July 10, 2020, Electric Boat filed a complaint against the Skobics in the United States District Court for the Middle District of Florida, bringing claims against the Skobics for fraud/fraudulent concealment, civil conspiracy to commit fraud, aiding and abetting fraud, violations and civil conspiracy in violation of the federal RICO Act, 18 U.S.C. §§ 1962, 1964, and the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Ann. §§ 772.103–104, and tortious interference and civil conspiracy to commit tortious interference.  *See* Compl., *Gen. Dynamics Electric Boat Corp. v. Skobic*, No. 3:20-cv-00769-TJC-MCR, Dkt. No. 1 (M.D. Fla. July 10, 2020) (the "*Skobic* Case").

22.     The Skobics filed the Second Amended FCA Complaint on December 7, 2020.  *84Partners*, Dkt. No. 102.  The same day, Electric Boat filed its First Amended Complaint in the *Skobic* Case. *See Skobic* Case, Dkt. No. 37.

23.    The Court dismissed the Skobics' Second Amended FCA complaint on September 22, 2021.  *84Partners*, Dkt. No. 118.  The same day, the Court entered an order administratively closing the *Skobic* Case for 60 days, affording the parties an opportunity to determine how to proceed in light of the dismissal of the FCA Case.  *Skobic* Case, Dkt. No. 45.

24.    On December 14, 2021, after the Skobics filed a notice of appeal in the FCA case, Electric Boat and the Skobics executed a tolling agreement.  That agreement applied to "[a]ny claims, causes of action, rights to payment, legal remedies, or equitable remedies that Electric Boat asserted in its original or amended complaint in the *Skobic* case, or any claims not explicitly asserted but which would relate back to [Electric Boat's] original complaint by amendment under Fed. R. Civ. P. 15 (c)(1)(B) because such claims 'arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'"  Tolling Agreement ¶ 2 (Ex. 4).  The tolling agreement defined all such claims as "Claims Against the Skobics."

25.    The tolling agreement provided that, for any such claims of Electric Boat against the Skobics, "[a]ny applicable statutes of limitation or statutes of repose … shall be suspended and tolled from July 10, 2020, the date Electric Boat filed its original complaint against the Skobics, through and including 60 days after . . . the expiration of the time to file a petition for writ of certiorari in the U.S. Supreme

Court from a decision of the Eleventh Circuit in the *84Partners* Case (including any extension that is granted of the time to file such a petition)[.]" *Id.* ¶ 3. The tolling agreement defined such period as "the Tolled Period."

26.     The tolling agreement further provided that "any action commenced within the Tolled Period that was not time barred as of July 10, 2020 shall be deemed timely filed and not time barred by any statutes of limitation or statutes of repose, or any similar legal or equitable theory, including, without limitation, laches, estoppel, or waiver[.]" *Id.* ¶ 6.

27.     On December 21, 2021, Electric Boat filed a notice of voluntary dismissal, without prejudice, against the Skobics. *Skobic* Case, Dkt. No. 49. On December 23, the Court dismissed the *Skobic* Case without prejudice. *Id.* Dkt. No. 50.

28.     On August 17, 2023, the Eleventh Circuit affirmed the District Court's dismissal with prejudice of Relator's Second Amended Complaint in the *84Partners* case. *See United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353 (11th Cir. 2023). On September 21, 2023, the Skobics filed a petition for rehearing en banc, which the Eleventh Circuit denied on October 24. *See* Order, *84Partners*, No. 21-13673-GG, Dkt. No. 80 (11th Cir. Oct. 24, 2023).

29.     On January 10, 2024, the Skobics filed an application to extend time to file a petition for a writ of certiorari with the United States Supreme Court. The

Court granted the extension, setting a February 21, 2024, filing deadline. The Skobics did not file a petition for a writ of certiorari.

30.    Before filing this Complaint, Electric Boat attempted without success to mediate and/or settle these claims with the Skobics.

## FACTUAL ALLEGATIONS

### A. Nuflo Was A Supplier To Electric Boat.

31.    Since 1998, Electric Boat has constructed and delivered Virginia-class nuclear submarines pursuant to contracts with the Navy.

32.    A single Virginia-class submarine includes over 1.7 million parts provided by over 2,100 suppliers.

33.    Nuflo was one of Electric Boat's suppliers.

34.    Nuflo manufactured piping components such as elbows, tees, and couplings.

35.    Electric Boat ordered parts from Nuflo via purchase orders, which recited the mechanical, material, dimensional, and quality-assurance criteria for the requested parts, among other requirements.

36.    Nuflo sometimes manufactured more parts than an Electric Boat purchase order required. Nuflo sometimes retained such excess parts (and their corresponding certification packages, as detailed below, *infra* ¶¶ 42–47) for years after the parts were manufactured before sending them to Electric Boat.

37.     After the events described in this Complaint, Nuflo was acquired by a successor corporation.  None of the allegations concerning Nuflo in this Complaint refer to that successor corporation.   None of the individuals identified in this Complaint are affiliated with that successor corporation.

38.     Under this new ownership, Nuflo's successor-in-interest remains a supplier to Electric Boat.

**B. The Nuflo Parts Sold To Electric Boat Were Subject To Specific Requirements.**

39.     Nuflo's manufacturing process could result in flaws that could render a part nonconforming to the specifications imposed by the Navy and the Navy's Naval Sea Systems Command ("NAVSEA") and incorporated by reference into Electric Boat's purchase orders.

40.     These flaws can sometimes be "weld-repaired"—such as by, for example, adding material to build up a thin wall or mend a crack.  A weld-repaired part, however, may or may not meet the standards set forth in the governing specifications and purchase orders.

41.     The governing specifications incorporated into Electric Boat's purchase orders to Nuflo—namely, Electric Boat Specification 3785, Electric Boat Standard Clause 76-147, and NAVSEA Technical Publication S9074-AR-GIB-010/278 ("Tech. Pub. 278"), among others—permitted welding only on certain types of materials, limited welding to certain parameters, required preapproval for welds

by Electric Boat, and restricted welding to qualified personnel using qualified procedures.

42.    Those governing specifications also mandated that, even where welding was permitted, approved, and performed by qualified personnel using qualified procedures, all welds had to be documented in order for the welded part to be conforming.  Such documentation is necessary for Electric Boat to evaluate the welds and decide whether to accept the parts.

43.    When Nuflo sent parts to Electric Boat, Nuflo personnel were required to and did execute certifications attesting—under penalty of law—that the parts "have been manufactured in accordance with all applicable specifications and purchase order requirements."

44.    The certifications and the other documents required to be delivered to Electric Boat with the parts are together known as the "certification package."

45.    Nuflo's certification packages for each part attested that all included test reports "represent the actual attributes of the items furnished on the order and that the test results are in full compliance with all specification and order requirements."

46.    Nuflo's certification packages for each part attested that, if weld-repairs had been conducted on the part, the repairs were consistent with the specifications imposed by the Navy and by Electric Boat's purchase orders.

47.    Nuflo's certification packages for each part attested that, if weld-repairs had been conducted on the part, the repairs had been documented and were described in the certification package.

48.    Nuflo's certification packages for each part were also required to include reports from each required test.

49.    For some parts, one required test report was the "liquid penetrant test" inspection report.

50.    During liquid penetrant testing, an inspector applies to a part a chemical dye, which reveals otherwise invisible surface discontinuities.

51.    Liquid penetrant testing is required on all parts of certain types, in order to detect discontinuities that could render the parts nonconforming.

52.    Nuflo's Quality Manual also required that liquid penetrant testing be performed on every welded part, including parts requiring production welds (*i.e.*, welds that were a necessary element of the production process) and parts that were weld-repaired.

53.    Liquid penetrant testing is used on welded areas because welds can create surface discontinuities, which can render the parts nonconforming.  Liquid penetrant testing can detect such discontinuities.

54.     Mickey Skobic was one of the Nuflo inspectors who sometimes conducted liquid penetrant inspection testing and who completed and signed liquid penetrant test reports.

55.     In addition to the inspection reports themselves, each certification package sent to Electric Boat for a part requiring a liquid penetrant inspection test contained a representation, signed by a Nuflo quality-control representative, stating: "100% Liquid Penetrant Inspection satisfactory per Nuflo Inc, Jacksonville, FL. See attached certification."

56.     Another required test report was the "first piece inspection" report.

57.     The first piece inspection report memorializes the heat treatment number for the part and provides the results of certain dimensional and tolerance inspections on the part.

58.     Heat treatment (or "heat lot") numbers are numbers assigned to lots of raw material, and they provide "traceability" back to the raw material from which the part was constructed.  Electric Boat uses heat treatment numbers to ensure that the raw material conforms to contract requirements.  FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40.

59.     Joanne Skobic sometimes completed and initialed the first piece inspection report.

60.    In addition to the first piece inspection reports themselves, each certification package sent to Electric Boat included a representation, signed by a Nuflo quality-control representative, stating "Visual and Dimensional Inspection satisfactory," which referred in part to the first piece inspection reports identifying the results of visual and dimensional inspections.

61.    Certification packages were usually delivered to Electric Boat via a commercial shipping company, such as YRC or UPS.

## C. False Certifications Of Compliance Impede Electric Boat's Robust Quality System.

62.    Electric Boat has a robust and multi-layered quality-assurance system.

63.    The Navy has approved Electric Boat's quality-assurance system.

64.    Part of Electric Boat's Navy-approved quality-assurance system is reviewing the certification packages provided by suppliers (including Nuflo), which provide important information related to the part that Electric Boat relies on as part of its quality-assurance process to ensure that, before Electric Boat employs the part in building a submarine, the part is conforming and safe.

65.    The Navy and Electric Boat expect and require these certification packages to be completed truthfully.

66.    False information in the certification packages impedes Electric Boat's quality-assurance process because it conceals information that Electric Boat would otherwise consider and address in its quality-assurance checks.

67.     If nonconforming or unauthorized weld-repairs, the use of unqualified inspectors, or other nonconformances had been disclosed to Electric Boat, Electric Boat would have taken appropriate corrective action, including rejecting the parts in question or requiring, before accepting the parts, that they be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs.

68.     When Electric Boat in fact discovered that certain Nuflo parts contained nonconforming or unauthorized weld-repairs or other nonconformances, it took corrective actions, including rejecting the parts, issuing Supplier Corrective Action Reports to Nuflo, and/or requiring Nuflo to correct the nonconformances.

**D. The Skobics Conspired To Conduct Unauthorized And Undocumented Weld-Repairs On Nuflo Parts While Disguising Repairs To Hide Their Misconduct.**

69.     Mickey and Joanne Skobic each knew that Navy specifications and Electric Boat's purchase orders prohibited weld-repairs unless Nuflo had received all required preapprovals and unless the weld-repairs were properly documented. *See* FCA Am. Compl. ¶¶ 65, 68, 92; *see* FCA SAC ¶¶ 190–91.

70.     Mickey and Joanne Skobic each knew that Nuflo certified compliance with these specifications and requirements when Nuflo delivered parts to Electric Boat.  *See* FCA Am. Compl. ¶¶ 92, 107; FCA SAC ¶ 211.

71.   Mickey Skobic knew that the liquid penetrant test reports he signed were part of the certification packages sent to Electric Boat.

72.   Joanne Skobic knew that the first piece inspection forms she completed and initialed were part of the certification packages sent to Electric Boat.

73.   Nonetheless, "beginning in 2005," Mickey Skobic agreed to join and assist others in a scheme to operate Nuflo as a criminal enterprise and to conduct and conceal nonconforming, unauthorized, and undocumented weld-repairs.  FCA Am. Compl. ¶¶ 206–08; FCA SAC ¶ 203.

74.   Mickey Skobic was integral to the scheme.  He was principally responsible for carrying out undocumented and unauthorized weld-repairs; he determined how to "disguise" those weld-repairs; he falsified records by failing to disclose weld-repairs when required; and he was part of a core group of conspirators—within and outside Nuflo—who executed the scheme to deliver and conceal nonconforming parts to Electric Boat.  Joanne Skobic also agreed to join and assist in the scheme, as detailed below. *Infra* ¶¶ 134–49.

75.   The Skobics identify the others whom they allege participated in that scheme as including John Licausi (Nuflo's president), Ryan Licausi (a production manager who also served as an inspector), Steve Cefalu (a Nuflo quality manager), Chris Moore (another quality manager), and Tommy Connor (a shop foreman), as well as SFS.  FCA Am Compl. ¶¶ 99, 115, 206–08, 236; FCA SAC ¶¶ 205, 214, 224,

226; *infra* ¶¶ 97–98, 105–07, 113–14, 120–21, and 132–33.  This group is referred to as the "Co-Conspirators."[2]

76.    Certain Co-Conspirators would ask Mickey Skobic to perform weld-repairs, and he would carry out those weld-repairs, even though he knew they were "illegal[]" under the governing specifications and purchase orders.  FCA Am. Compl. ¶¶ 99, 115, 207; FCA SAC ¶¶ 214, 226.  Initially—by June 11, 2006—"JL [*i.e.*, John Licausi] and Tommy [Connor] ha[d] [Mickey Skobic] doing" "illegal[] weld[s]" on at least "4 or 5 occasions."  FCA Am. Compl. ¶ 115; FCA SAC ¶ 226.

77.    Mickey Skobic's "journal reflects at least 190 specific instances on distinct dates" in "July 2006 through October 2013" of the Co-Conspirators "direct[ing]" him to perform weld-repairs, and Mickey Skobic performing those repairs.  FCA Am. Compl. ¶¶ 207–08; *see* FCA SAC ¶¶ 214, 226.

78.    Mickey Skobic "weld[ed] over cracks, without documentation or proper non-destructive examination to ensure the part was conforming to specification," "weld[ed] on base metals for which they were not qualified," "weld[ed] on parts for which purchase order specifications expressly prohibited any welding," "weld[ed] in [unpermitted] locations . . . such as on the end preps of

---

[2] In this Complaint, Electric Boat has brought claims only against the Skobics, based on the admissions the Skobics have made.  Electric Boat is not aware of similar admissions by the other individuals identified in this paragraph.  To the extent discovery reveals that claims against other individuals or entities are appropriate, Electric Boat reserves the right to amend this Complaint.

parts," and performed welds that "did not follow" Navy-approved welding procedures.  FCA Am. Compl. ¶¶ 100, 105; FCA SAC ¶¶ 209–10.

79.    In all, Mickey Skobic conducted improper repair welds on "thousands of individual parts" delivered to Electric Boat and NNS.  FCA Am. Compl. ¶ 108 (emphasis omitted); *see* FCA SAC ¶¶ 11, 235.  Appendix B to the Skobics' SAC purportedly lists "Specific Examples of Non-conforming [Nuflo] Parts"; but with the exception of the last four items in that Appendix, Mickey Skobic was personally responsible for all of these parts and was the one who performed their nonconforming weld-repairs.  *Compare* FCA SAC, App'x B, *with* FCA Am. Compl. ¶¶ 212, 214, 219–21, 225–26, 230–31, 233, 235–38, 240, 242.

80.    Mickey Skobic understood at the time that his weld-repairs were nonconforming.  For example, the Skobics describe a journal entry recounting that in 2006 Mickey Skobic welded "a[n 8-inch] flange for [Electric Boat] for a submarine which was illegally welded on the ends."  FCA Am. Compl. ¶ 115; FCA SAC ¶ 226.

81.    The Skobics and the Co-Conspirators covered their tracks to avoid detection by the quality-assurance systems of Electric Boat, NNS, and the Navy, and weld "repairs [were] machined to disguise them."  FCA Am. Compl. ¶ 101; FCA SAC ¶ 212.

82.     The "disguis[ing]" that Mickey Skobic conducted consisted of polishing, buffing, and grinding that rendered weld-repairs invisible to the naked eye and undetectable during routine inspection.  FCA Am. Compl. ¶ 101; FCA SAC ¶ 212.

83.     For at least "a decade," Mickey Skobic, Joanne Skobic, and the Co-Conspirators "regularly and intentionally falsified records purporting to show that parts were properly manufactured, assembled, inspected and tested when they were not."  FCA Am. Compl. ¶ 92; *see* FCA SAC ¶ 211.

84.     Mickey Skobic (as well as the Co-Conspirators) also deliberately "made weld-repairs . . . without documenting [them] on parts travelers or using documentation such as repair travelers, meaning that such repair welds are not traceable."  FCA Am. Compl. ¶ 109; *see id.* ¶¶ 212–13; *accord id.* ¶¶ 217, 223; FCA SAC ¶¶ 107, 191, 234, 238.

85.     The Skobics admit that "even when welding might be an appropriate corrective action," in the "overwhelming majority of cases neither the defect nor the weld repair [was] recorded."  FCA Am. Compl. ¶ 110; FCA SAC ¶ 234.

86.     Mickey Skobic understood that this scheme resulted in weld-repairs that were "in violation of the contractual specifications for [the] parts[.]"  FCA Am. Compl. ¶ 116; *see also id.* ¶¶ 100, 109, 119–21; FCA SAC ¶¶ 191, 210, 239–40.

87.     Once the improper, undocumented, and unauthorized weld-repairs had been conducted and disguised, the Co-Conspirators sent to Electric Boat, via a commercial shipping company (such as YRC or UPS), the certification packages corresponding to the parts they were delivering that falsely certified the parts as conforming and did not disclose the weld-repairs.  The Co-Conspirators each intended for Electric Boat to rely on these false certifications by accepting parts when, had Electric Boat known the truth, Electric Boat either would have rejected the parts or would have required before accepting the parts that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs.

88.     SFS, a separate corporation, was created by individuals including the Co-Conspirators (whom the Skobics identify as "Nuflo . . . officers") to further the fraudulent scheme by facilitating "false certification[s] that [Nuflo] products conform[ed] to contractual specifications."  Orig. FCA Compl. ¶¶ 70, 72.

89.     In particular, individuals including the Co-Conspirators caused SFS to enter into contracts with Electric Boat, and then SFS "knowingly" made "false certification[s]" of conformance to Electric Boat in coordination with individuals including the Co-Conspirators.  *Id.* ¶¶ 70, 72–73.

90.     Mickey Skobic's years of "illegal[]," nonconforming, and undocumented weld-repair repeatedly involved improper welds on parts sold to SFS

and then resold to Electric Boat.  *See, e.g.*, FCA Am. Compl. ¶¶ 115, 226, 230, 232; FCA SAC ¶¶ 50, 226.

91.  Each of the Skobics was "personally aware" of "the improper policies and practices of . . . Nuflo," as well as "[Nuflo's] relationship with SFS."  Orig. FCA Compl. ¶ 19; *see id.* ¶ 72.

**E. Mickey Skobic Performed Fraudulent Weld-Repairs.**

92.  In their FCA Amended Complaints, the Skobics admit that Mickey Skobic's journal memorializes examples of the nonconforming weld-repairs that he made as part of the fraud.  FCA Am. Compl. ¶ 108; FCA SAC ¶ 224.

93.  ***August 2013.***  In August 2013, Mickey Skobic weld-repaired several 6-inch elbows that were each cracked.  FCA Am. Compl. ¶ 242; *accord* FCA SAC, App'x B at B-1.  Those cracks rendered each of these nine carbon-steel elbows nonconforming to NAVSEA and Electric Boat specifications.

94.  The purchase order for these parts, PO PPZ062-090, incorporated by reference Electric Boat Specification 3785 and Electric Boat Standard Clause 76-147, and did not permit weld-repair on carbon steel parts absent an Electric Boat-approved welding procedure specific to carbon steel.  Those specifications also required a signed certification that all furnished items were in full compliance with all purchase order and specification requirements.

95.    Nuflo did not seek or obtain approval from Electric Boat for any procedure applicable to welding carbon steel parts like these elbows.

96.    Mickey Skobic knew that Nuflo did not have an authorized procedure for welding carbon steel parts and that accordingly, the purchase order's specifications prohibited weld-repair on these carbon steel elbows.

97.    Yet Mickey Skobic nonetheless weld-repaired all nine elbows, and he did so without documenting the repairs.  FCA Am. Compl. ¶ 242.  Those weld-repairs, and Mickey Skobic's failure to properly document them, violated the specifications that the purchase order made applicable to these parts.

98.    Steve Cefalu then signed, under penalty of law, a statement in the parts' certification package, as a Nuflo quality-control representative, attesting that "[these parts] have been manufactured in accordance with all applicable specifications and purchase order requirements."   Mickey Skobic and Steve Cefalu knew this certification was false and intended to induce Electric Boat to rely on this false certification by accepting these parts when, but for the false certification, Electric Boat would not have done so.  FCA Am. Compl. ¶¶ 99, 152, 207; FCA SAC ¶¶ 211, 214, 226.

99.    These parts and this certification package were shipped via YRC to Electric Boat's Quonset Point, Rhode Island shipyard on September 6, 2013, with

"no documentation of any weld-repairs," FCA Am. Compl. ¶ 242, and Electric Boat received the parts and the certification package on September 20, 2013.

100. ***October 2011.*** In October 2011, Mickey Skobic weld-repaired a 10-inch elbow that had been damaged. *Id*. ¶ 233; *accord* FCA SAC, App'x B at B-1. That damage rendered this carbon-steel elbow nonconforming to NAVSEA and Electric Boat specifications.

101. Mickey Skobic's journal describes the part as having a "crack [that] is 3 [inches] long!" FCA Am. Compl. ¶ 233.

102. The purchase order for this part, PO GPV127-075 Supp. 008, incorporated by reference Electric Boat Specification 3785, Electric Boat Standard Clause 76-147, and NAVSEA Tech. Pub. 278, and did not permit weld-repair on carbon steel parts absent an Electric Boat-approved welding procedure specific to carbon steel. Those specifications also required a signed certification that all furnished items were in full compliance with all purchase order and specification requirements.

103. Nuflo did not seek or obtain approval from Electric Boat for any procedure applicable to welding carbon steel parts like this elbow.

104. Mickey Skobic knew that Nuflo did not have an authorized procedure for welding carbon steel parts and that accordingly, the purchase order's specifications prohibited weld-repair on this carbon steel elbow.

105.   But Mickey Skobic nonetheless weld-repaired this elbow, and he did so without documenting the weld-repair.  *See id*. ¶¶ 233–34.  That weld-repair, and Mickey Skobic's failure to document it, violated the specifications made applicable by the purchase order for these parts.

106.   Steve Cefalu then signed, under penalty of law, a statement in this part's certification package, as a Nuflo quality-control representative, that "[this part] ha[s] been manufactured in accordance with all applicable specifications and purchase order requirements."  Mickey Skobic and Steve Cefalu knew this certification was false and intended to induce Electric Boat to rely on this false certification by accepting this part when, but for the false certification, Electric Boat would not have done so.  *Id.* ¶¶ 99, 152, 207; FCA SAC ¶¶ 211, 214, 226.

107.   These parts and this certification package were shipped to SFS for subsequent shipment to Electric Boat, and there were "no records in the [certification] package that indicate[d] any part was weld repaired prior to shipment by Nuflo to SFS on April 18, 2012."  FCA Am. Compl. ¶ 234.

108.   SFS shipped this elbow and its certification package to Electric Boat's Quonset Point, Rhode Island shipyard via YRC.  Electric Boat received the certification package and the elbow on May 23, 2012.

109.   ***September and October 2009.***  In September and October 2009, Mickey Skobic conducted weld-repairs on several 8-inch elbows that had been

damaged. *Id.* ¶¶ 220–21; *accord* FCA SAC, App'x B at B-1.  That damage rendered each of those elbows nonconforming to NAVSEA and Electric Boat specifications.

110.   The purchase order for these parts, PO GPU086-077 Supp. 009, incorporated by reference Electric Boat Specification 3785, Electric Boat Standard Clause 76-147, and NAVSEA Tech. Pub. 278, and did not permit weld-repair absent approval from Electric Boat; required submission to Electric Boat of all welding records; and required a signed certification that all furnished items were in full compliance with all purchase order and specification requirements.

111.   Nuflo did not seek or obtain approval from Electric Boat to weld-repair these elbows.

112.   Mickey Skobic knew that the purchase order's specifications prohibited weld-repair on these elbows unless Nuflo obtained permission for and documented the repairs.

113.   But Mickey Skobic nonetheless weld-repaired these elbows, and he did so without properly documenting the weld-repair.  FCA Am. Compl. ¶¶ 220–24. Those weld-repairs, and Mickey Skobic's failure to properly document them, violated the specifications that the purchase order made applicable to these parts.

114.   Steve Cefalu then signed, under penalty of law, a statement in these parts' certification package, as a Nuflo quality-control representative, that "[these parts] have been manufactured in accordance with all applicable specifications and

purchase order requirements."   Mickey Skobic and Steve Cefalu knew this certification was false and intended to induce Electric Boat to rely on this false certification by accepting these parts when, but for the false certification, Electric Boat would not have done so.  *Id.* ¶¶ 99, 152, 207; FCA SAC ¶¶ 211, 214, 226.

115.   These parts and this certification package were shipped to Electric Boat's Quonset Point, Rhode Island shipyard via UPS.  Electric Boat received these elbows and the corresponding certification package on or about October 14, 2009.

116.   ***June 2009.***  In June 2009, Mickey Skobic weld-repaired three 6-inch elbows that were each cracked.  FCA Am. Compl. ¶¶ 212–13; FCA SAC, App'x B at B-1.  Those cracks rendered each of those elbows nonconforming to NAVSEA and Electric Boat specifications.

117.   The purchase order for these parts, PO GPU086-077 Supp. 009, incorporated by reference Electric Boat Standard Clause 76-147 and NAVSEA Tech. Pub. 278.  The purchase order did not permit weld-repair absent approval from Electric Boat; required submission to Electric Boat of all welding records; and required a signed certification that all furnished items were in full compliance with all purchase order and specification requirements.

118.   Nuflo did not seek or obtain approval from Electric Boat to weld-repair these elbows.

119.   Mickey Skobic knew that the purchase order's specifications prohibited weld-repair on these elbows unless Nuflo obtained permission for and documented the repairs.

120.   But Mickey Skobic nonetheless weld-repaired these elbows, and he did so without properly documenting the weld-repairs.  FCA Am. Compl. ¶¶ 212–13. Those weld-repairs, and Mickey Skobic's failure to properly document them, violated the specifications that the purchase order made applicable to these parts.

121.   Steve Cefalu then signed, under penalty of law, a statement in these parts' certification package, as a Nuflo quality-control representative, that "[these parts] have been manufactured in accordance with all applicable specifications and purchase order requirements."   Mickey Skobic and Steve Cefalu knew this certification was false and intended to induce Electric Boat to rely on this false certification by accepting these parts.  *Id.* ¶¶ 99, 152, 207; FCA SAC ¶¶ 211, 214, 226.

122.   These parts and this certification package were shipped to Electric Boat's Quonset Point, Rhode Island shipyard via UPS.  Electric Boat received the certification package and the elbows on October 13, 2009.

123.   These are only four examples out of many improper, undocumented, and unauthorized weld-repairs that Mickey Skobic performed while at Nuflo.  FCA Am. Compl. ¶¶ 108, 208; FCA SAC ¶ 224.

**F. Mickey Skobic Completed And Signed Inspection Reports While Knowingly Failing To Disclose That Parts Had Been Weld-Repaired.**

124.   Mickey Skobic also fraudulently completed and signed liquid penetrant testing ("LPT") inspection reports on parts he knew had been weld-repaired without disclosing the repairs.

125.   As a certified Level II nondestructive testing inspector, Mickey Skobic had been trained on and knew that the NAVSEA and Electric Boat specifications invoked by Electric Boat's purchase orders required that LPT inspection be performed on many Nuflo parts.

126.   Mickey Skobic had been trained on and knew that the LPT inspection reports he completed and signed were included in certification packages sent to Electric Boat.

127.   Mickey Skobic had a duty, as a certified Level II nondestructive testing inspector on parts intended for Electric Boat, to disclose nonconformances of which he was aware and to provide full, truthful, and nonmisleading information concerning parts he certified to Electric Boat.

128.   Mickey Skobic nonetheless completed and signed LPT inspection reports for parts that had been improperly weld-repaired without disclosing the repairs.  The parts in question required LPT inspections regardless of whether weld-repair had occurred, and the presence of LPT inspection reports in the certification packages thus did not indicate that weld-repair had occurred.

129.   Notwithstanding the unauthorized and hidden weld-repairs, Mickey Skobic's LPT inspection reports designated the weld-repaired parts "ACCEPT." He did not disclose on the LPT inspection reports or elsewhere that unauthorized weld-repairs had been conducted on the parts. He knew that these LPT inspection reports would be included in the certification packages sent to Electric Boat without being accompanied by the documentation required for weld-repairs.

130.   Each LPT inspection report completed by Mickey Skobic contains the following statement: "The recording of false, fictitious or fraudulent statements or entries on this document may be punishable as a felony under Federal Statutes."

131.   As one example, on February 24, 2012, Mickey Skobic completed and signed an LPT inspection report for nine parts, manufactured pursuant to PO GPV056-137 Supp. 007. In that LPT report, Mickey Skobic designated the parts "ACCEPT" without disclosing weld-repairs. He did so even though he knew that the parts were nonconforming because they had been weld-repaired absent the required preapproval from Electric Boat, and because the weld-repairs had not been properly documented. Mickey Skobic knew that the LPT inspection reports would be included in the certification package sent to Electric Boat without being accompanied by the documentation required for weld-repairs.

132.   Mickey Skobic knew that all nine of those parts had been weld-repaired because that same day, he himself had weld-repaired all nine. By designating the

parts "ACCEPT" in the LPT report without disclosing the weld-repairs he himself performed, Mickey Skobic misleadingly implied that the parts were acceptable when he knew they were nonconforming because the parts had been weld-repaired without proper documentation and without the required preapproval from Electric Boat.

133.   Chris Moore then signed, under penalty of law, a statement in these parts' certification package, as a Nuflo quality-control representative, attesting that "[these parts] have been manufactured in accordance with all applicable specifications and purchase order requirements."   Mickey Skobic knew this certification was false and intended to induce Electric Boat to rely on this false certification by accepting these parts when, but for the false certification, Electric Boat would not have done so.   According to the Skobics' FCA Amended Complaints, Chris Moore knew about and directed unauthorized and undocumented weld-repairs, and thus also knew this certification was false and intended to induce Electric Boat to rely on it.  FCA Am. Compl. ¶¶ 99, 207–08; FCA SAC ¶¶ 214, 226.

134.   Nuflo shipped these nine parts, as well as the certification package containing the LPT inspection report Mickey Skobic fraudulently completed, to Electric Boat's Quonset Point, Rhode Island shipyard via YRC.   Electric Boat received the certification package and the parts on April 3, 2012.

### G. Joanne Skobic Participated In The Scheme.

135. "[U]ndocumented and unauthorized weld repairs" and "falsifi[ed] . . . records" were just one part of the multi-pronged fraud in which the Skobics participated. FCA Am. Compl. ¶ 95; FCA SAC ¶¶ 107, 210, 240. The fraud also included "falsified heat treat numbers," "failure to perform required inspection and testing," and use of "unqualified personnel," "improper inspections," and "fraudulently-certified inspectors." FCA Am. Compl. ¶¶ 13, 95, 125; FCA SAC ¶¶ 20, 107, 210, 240, 252.

136. In particular, instead of "properly training employees" on inspection protocols, the Co-Conspirators "gave unqualified, untrained employees the answers to . . . certification tests[,]" yielding "fraudulently-certified inspectors." FCA Am. Compl. ¶ 125; FCA SAC ¶ 252.

137. These quality inspectors "regularly . . . used uncalibrated gages in [their] inspection[s]." FCA Am. Compl. ¶ 127; *see* FCA SAC ¶ 257.

138. The Skobics admit that these quality inspectors "routinely . . . destroy[ed] accurate traceability" of parts by "intentionally chang[ing]" heat treatment numbers. FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40.

139. These quality inspectors intentionally changed heat treatment numbers "to reflect conformity to requirements without verifying the conformance of the material . . . by testing its chemical properties . . . and without documenting the

changed number, thus destroying accurate traceability[.]"  FCA Am. Compl. ¶ 120;

FCA SAC ¶¶ 239–40.

140.   "Traceability" is a positive means of identifying material to its

Objective Quality Evidence.

141.   "Objective Quality Evidence" is the quantitative and qualitative data of

all mechanical, chemical, and performance tests performed on material and

memorializes that the material conforms to requirements.

142.   To preserve traceability, the specifications imposed by NAVSEA and

by Electric Boat's purchase orders disallow undocumented changes to heat treatment

numbers.

143.   Joanne Skobic herself was one of the "fraudulently-certified

inspectors."  FCA Am. Compl. ¶ 125; FCA SAC ¶¶ 20, 252.

144.   In particular, from 2013 to 2015, Joanne Skobic "perform[ed] various

quality inspections," even though she was "not properly certified as an inspector."

FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.  So when the Skobics allege that the fraud

relied on "unqualified personnel" and giving "unqualified, untrained employees the

answers to . . . certification tests," Joanne Skobic was—on information and belief—

one of the employees who received the answers to certification tests, and she had

contemporaneous knowledge of the reliance on "fraudulently-certified inspectors"

and is the source of the FCA Amended Complaints' allegations on that issue.  FCA Am. Compl. ¶¶ 89, 95, 125; FCA SAC ¶¶ 107, 210, 240, 251–52, 254.

145.   Joanne Skobic's responsibilities included "verification[s] of material composition, heat treatment, and critical dimensional checks," which are the inspections reflected in the first piece inspection forms that Joanne Skobic sometimes completed.  FCA Am. Compl. ¶ 13; FCA SAC ¶ 20.  So when the Skobics allege that these quality inspectors "routinely . . . destroy[ed] accurate traceability" of parts by "intentionally chang[ing]" heat treatment numbers, FCA Am. Compl. ¶ 120, FCA SAC ¶¶ 239–40, Joanne Skobic was—on information and belief—one of the inspectors who intentionally changed heat treatment numbers and/or had contemporaneous knowledge of other inspectors doing so and is the source of the FCA Complaint's allegations on this issue.  *Accord* Orig. FCA Compl. ¶ 44 (similar allegations).

146.   Joanne Skobic completed first piece inspections for parts that, on information and belief, she knew were nonconforming as a result of improper and undocumented weld-repairs, the use of unqualified inspectors, or altered heat treatment numbers.  Joanne Skobic nonetheless designated those parts on first piece inspection forms as "SAT"—meaning satisfactory—as to "Visual," "Visual and Dimensional," and "Marking," the last of which she understood as indicating that

the heat treatment numbers recorded for the parts were accurate and had not been altered.

147.   The first piece inspection forms, including the heat treatment numbers memorialized on those forms, were included in the certification packages mailed to Electric Boat and certified a part's conformance to dimensional and tolerance requirements.

148.   Joanne Skobic was also responsible for ensuring, at least once weekly, that Nuflo's manufacturing and repair processes, and associated documents, were properly preserving the required traceability of each part.

149.   Joanne Skobic had a duty, by virtue of serving as an inspector on parts intended for Electric Boat, to disclose nonconformances of which she was aware and to provide full, truthful, and nonmisleading information concerning the parts she certified to Electric Boat.

150.   Joanne Skobic, Mickey Skobic, and the Co-Conspirators intended to induce Electric Boat's reliance on their false certifications and nondisclosures.  They knew that, if Electric Boat had known the truth about the use of unqualified inspectors and altered heat treatment numbers, Electric Boat either would have rejected the parts or would have required, before accepting the parts, that the parts be reinspected by qualified inspectors and that any altered heat treatment numbers be corrected.

**H. The Skobics Hid Their Wrongdoing In Violation Of Their Duties To Electric Boat.**

151.   Mickey Skobic knew since at least 2005 that the weld-repairs he conducted were "undocumented" and "unauthorized" and that the scheme he was participating in was "illegal[]."   FCA Am. Compl. ¶¶ 112, 115, 206; FCA SAC ¶¶ 107, 188, 226.

152.   Joanne Skobic—as Mickey Skobic's spouse, co-worker, and co-conspirator—knew that Mickey Skobic was conducting improper welds and failing to document them.

153.   Joanne Skobic knew about her own conduct as a "fraudulently-certified inspector[]" who conducted material inspections without being certified to do so. FCA Am. Compl. ¶¶ 13, 125; FCA SAC ¶¶ 20, 252.   She also knew about the intentional changing of heat treatment numbers and destruction of accurate traceability.  *See* FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40.

154.   Mickey and Joanne Skobic each had a duty to report the unlawful activity they knew about or suspected.

155.   Electric Boat Specification 2678, which Electric Boat's purchase orders to Nuflo incorporated by reference, specifies that employees of Electric Boat

suppliers, like Nuflo, who are "aware of, or hav[e] reason to suspect, malpractice or fraud & falsification," must report it.[3]

156.   Electric Boat Specification 2678 imposed this duty on employees of suppliers by requiring each supplier to "[a]lert all employees to" these requirements "during new hire indoctrination"; to "[a]nnually provide refresher training" on these requirements "for all employees"; and to post "a visible reminder notice . . . in conspicuous and prominent locations throughout the facility."

157.   An example of the required notice is provided as Figure 1 below.

---

[3] In particular, all of the specific purchase orders identified in this Complaint incorporated by reference Electric Boat Specification 2678.

**Figure 1**

EB Spec. 2678K
Page 33 of 35
**Appendix   D**

# NOTICE

Any party aware of, or having reason to suspect, **MALPRACTICE OR FRAUD & FALSIFICATION** is obligated to report this violation anonymously or in person to:

  a.) Company Supervision or Management,
  b.) Purchaser Supervision or Management,
  c.) Purchaser Quality Representative,
  d.) Purchaser Buyer, or
  e.) Department of Defense Hotline
    • telephone (800) 424-9098 or
    • website
      http://www.dodig.osd.mil/hotline/hotline7.htm
    • email  hotline@dodig.osd.mil or
    • mail to
      Department of Defense Hotline
      The Pentagon
      Washington, DC 20301-1900

Should such a notification be necessary, information including location, date(s), time, names of people involved, and violation suspected would be most helpful to promote an investigation.

# NOTICE

158.   Upon information and belief, during the Skobics' employment with Nuflo, Nuflo included in both new-hire and annual refresher training the requirement to report malpractice or fraud and falsification.

159.   Upon information and belief, during the Skobics' employment with Nuflo, Nuflo posted the Notice identified in Figure 1.  That Notice expressly stated that an employee's report of malpractice or fraud and falsification could be made anonymously.

160.   As a result of Electric Boat Specification 2678, the training they received on its requirements, and the notices posted at Nuflo facilities, Mickey and Joanne Skobic each had a duty to report the unlawful activity that they knew about or suspected.[4]

161.   Electric Boat Specification 2678 identifies the following as "examples of malpractice and fraud & falsification" required to be reported: "Issuing a procedure or instructions known to contain unauthorized deviation(s) to contractual requirements"; "Knowingly waiving or eliminating a contractual requirement without authority to do so"; "Deliberately accepting unsatisfactory work"; "Intentionally performing unacceptable work"; "Failing to report problems or unsatisfactory conditions in one's own workmanship"; "Verifying by signature that an action was taken, knowing in fact the action was not taken, or not performing the required checks or verifications to assure the action was taken"; "Verifying performance of action based on hearsay, not personal observation"; "Tampering

---

[4] Where, as here, the employee believed that "Company Supervision or Management" was involved in fraud and falsification, Electric Boat Specification 2678 required that the fraud and falsification be reported outside the company.

with calibrated instruments to avoid rejection of work"; "Falsifying dates on records to comply with frequency or deadline requirements"; "Falsifying data to cover-up a procedure or drawing deviation"; "Falsifying data to have work accepted, thereby avoiding further work or rework"; and "Concealing or not reporting information on malpractice, fraud, or falsification known to have been committed by others."

162.   These requirements applied throughout the period during which Mickey and Joanne Skobic were concealing their misconduct and the misconduct of the Co-Conspirators.

163.   Instead of disclosing what they knew to Electric Boat or to the government, and in violation of their clear duties to Electric Boat, Mickey and Joanne Skobic each continued to hide their misconduct and the misconduct of the Co-Conspirators.

## I.  The Skobics Hid Their Wrongdoing To Manufacture A False Claims Act Lawsuit.

164.   Mickey and Joanne Skobic decided not to disclose their misconduct, and the misconduct of Co-Conspirators, in order to personally benefit themselves.

165.   In particular, Mickey and Joanne Skobic each intended to manufacture a False Claims Act lawsuit against Nuflo, Electric Boat, and NNS—so that they could obtain not just the income they received as Nuflo employees, but the 30% bounty the FCA can award to relators.

166.   Mickey Skobic kept a journal memorializing his and the Co-Conspirators' misconduct beginning in May 2006 and continuing through October 2013.  FCA Am. Compl. ¶¶ 115, 207; FCA SAC ¶¶ 214, 226.  For example, in 2006, Mickey Skobic wrote in his journal that he would "take a picture" of an improper weld "as proof" of the noncompliant work Mickey Skobic was performing at his Co-Conspirators' direction.  FCA Am. Compl. ¶ 115; FCA SAC ¶ 226.

167.   Mickey and Joanne Skobic could have turned this journal over to Electric Boat, NNS, or the Navy long ago to stop the years-long fraud in which they allege they participated.

168.   But instead, Mickey and Joanne Skobic hid the journal and continued to build their purported FCA lawsuit so that, when the opportunity arose, they might profit from the fraud in which they participated.

169.   When Mickey Skobic left his job at Nuflo in October 2014, a month before the Skobics filed their FCA lawsuit, he did not leave the journal behind—as he would have been required to do had he been acting as a Nuflo employee.  Instead, Mickey Skobic personally kept the journal, and the Skobics made the journal the centerpiece of their FCA lawsuit.

170.   Because Mickey and Joanne Skobic intended to use their participation in the fraud and misconduct to build an FCA lawsuit against Nuflo, Electric Boat, and NNS from which they would personally benefit, Mickey and Joanne Skobic each

had a personal stake in the fraud and misconduct separate from their duties as Nuflo employees.

171.   Moreover, the Skobics' scheme was at least partially successful: in July 2017, Nuflo was dismissed from the FCA case pursuant to a settlement agreement with the United States.   That agreement required Nuflo to pay Relator up to $100,000, a sum which, on information and belief, Nuflo paid and Relator 84Partners—as corporate alter ego of the Skobics—received.

**J.  The Skobics' Scheme Inflicted Great Harm On Electric Boat.**

172.   The scheme perpetrated by the Skobics has inflicted millions of dollars in damages on Electric Boat and hindered Electric Boat's performance of its contracts with the Navy.

173.   Due to this scheme, Nuflo provided parts to Electric Boat that did not comply with the requirements imposed by Electric Boat's purchase orders and NAVSEA's specifications.   FCA Am. Compl. ¶¶ 92, 100–01, 106, 116, 121–22; FCA SAC ¶¶ 11, 210, 212, 234–35, 245.

174.   As a result of the scheme, Electric Boat has had to undertake, at great expense, an intensive investigation and major remediation effort to identify, segregate, re-test, and otherwise address Nuflo's nonconforming parts.   Though that investigation and remediation effort identified nonconforming Nuflo parts, it did not reveal an intentional fraud at Nuflo.   Electric Boat did not know of the Skobics' own

intentional fraud and misconduct until the *84Partners'* FCA Amended Complaint revealed their role in the intentional fraud scheme.

175.    Electric Boat's investigation and remediation effort included, among other things, Electric Boat personnel conducting: an investigation to bound, identify, and evaluate affected systems; in-person audits of Nuflo's practices; interviews with Nuflo's personnel and executives; and examinations of the capability of Nuflo's nondestructive testing inspectors.

176.    In particular, Electric Boat had to hire an additional workforce of full-time inspectors, who had to use costly and specialized tests to search for and identify otherwise invisible and undocumented weld-repairs.  These specialized tests are not generally required by Electric Boat's contracts and are generally not conducted because of the time they take, the expense they inflict, and the risk that the tests themselves will damage the parts.

177.    All these efforts have forced Electric Boat to incur millions of dollars in costs.

## COUNT I

### Fraud/Fraudulent Concealment (Against Mickey Skobic)

178.    Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 1–2, 9–34, 60, 87–88, 90, and 163–69 above.

179.   Mickey Skobic intentionally and repeatedly concealed and failed to disclose material facts.  In particular, he intentionally and repeatedly concealed and failed to disclose material and improper, nonconforming, unauthorized, and undocumented weld-repairs on parts he knew were destined for Electric Boat. Mickey Skobic concealed these nonconforming welds by, among other things, "machin[ing]" those welds "to disguise them" (*see supra* ¶¶ 4, 6–7, 69–86, 90, 92–123, 151, 154–63).  FCA Am. Compl. ¶ 101; FCA SAC ¶ 212.

180.   In addition, Mickey Skobic repeatedly completed and signed LPT inspection reports designating parts as "ACCEPT" even though he knew that the parts were nonconforming because they had been weld-repaired absent the required preapproval from Electric Boat and because those weld-repairs had not been properly documented.  Mickey Skobic knew that the LPT inspection reports would be included in the certification package sent to Electric Boat without being accompanied by the documentation required for weld-repairs (*see supra* ¶¶ 49–55, 71, 124–34).

181.   Mickey Skobic knew that these material facts should have been disclosed to Electric Boat.  In particular, he knew that the specifications imposed by NAVSEA and by Electric Boat's purchase orders required that, to be conforming, weld-repairs had to be preapproved by Electric Boat and properly documented and disclosed to Electric Boat (*see supra* ¶¶ 39–48, 62–70).

182.   Mickey Skobic had duties to disclose these material facts (*see supra* ¶¶ 8, 69–71, 74, 81–86, 92–134, 151, 154–63).

a. Mickey Skobic had a duty deriving from Electric Boat Specification 2678, and the notice he received of it, to report any malpractice, fraud, or falsification of parts or part documentation of which he was aware or had reason to suspect.

b. Mickey Skobic had a duty, as a Level II nondestructive testing inspector, to disclose nonconformances of which he was aware and to provide full, truthful, and nonmisleading information concerning parts he certified to Electric Boat.

c. Mickey Skobic had a duty arising from his designations of parts on LPT inspection reports as "ACCEPT," which were fraudulently misleading given the nonconformances, malpractice, fraud, and falsification of which he was aware.

d. Mickey Skobic had a duty arising from his superior knowledge of nonconforming weld-repairs on parts.  Electric Boat could not have obtained this knowledge through the exercise of due diligence, precisely because of Mickey Skobic's efforts to "disguise" those repairs and his failure to document them.

183.   Mickey Skobic intentionally disregarded these duties knowing and intending that his concealment and nondisclosure of material facts would induce Electric Boat to act by accepting nonconforming parts from Nuflo and SFS.   In particular, he knew that, if Electric Boat had known that parts contained unauthorized and undocumented weld-repairs, Electric Boat either would reject the parts or would require, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs (*see supra* ¶¶ 9, 62–87, 172–77).

184.   Electric Boat detrimentally relied on the fraudulent concealment by accepting parts from Nuflo and SFS.  If Electric Boat had known the material facts that Mickey Skobic failed to disclose, Electric Boat either would not have accepted parts from Nuflo and SFS or would have required, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs (*see supra* ¶¶ 62–68, 172–77).

185.   Electric Boat has suffered damages due to this fraudulent concealment, including the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of Mickey Skobic's fraudulent concealment, were falsely certified (*see supra* ¶¶ 172–77).

## COUNT II

### Fraud/Fraudulent Concealment (Against Joanne Skobic)

186.   Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 1–4, 6–7, 10–35, and 164–70 above.

187.   Joanne Skobic intentionally and repeatedly failed to disclose material facts.  In particular, she intentionally and repeatedly concealed and failed to disclose (a) Nuflo's reliance on "fraudulently-certified inspectors" (including Joanne Skobic herself), FCA Am. Compl. ¶¶ 13, 125; FCA SAC ¶¶ 20, 251–52, 254; (b) altered heat treatment numbers; and (c) material and improper, nonconforming, unauthorized, and undocumented weld-repairs on parts she knew were destined for Electric Boat (*see supra* ¶¶ 5, 56–61, 69–70, 72, 135–40, 152–63).

188.   In addition, Joanne Skobic repeatedly included false information— namely, altered heat treatment numbers—in first piece inspection reports she completed and initialed, and she fraudulently designated parts as "SAT" as to "Visual," "Visual and Dimensional," and "Marking" despite her knowledge of Nuflo's reliance on fraudulently-certified inspectors, alteration of heat treatment numbers, and material and improper, nonconforming, unauthorized, and undocumented weld-repairs.  She intentionally and knowingly did not disclose the

reliance on fraudulently-certified inspectors, altered heat treatment numbers, and weld-repairs (*see supra* ¶¶ 5, 56–59, 72, 135–50, 152–63).

189.   Joanne Skobic knew that these material facts should have been disclosed to Electric Boat.  In particular, she knew that Nuflo relied on "fraudulently-certified inspectors," FCA Am. Compl. ¶ 125; FCA SAC ¶¶ 251–52, 254, and that the specifications imposed by NAVSEA and by Electric Boat's purchase orders prohibited undocumented changes to heat treatment numbers and required that weld-repairs be disclosed to Electric Boat (*see supra* ¶¶ 5, 39–48, 69, 72, 135–50, 152–54).

190.   Joanne Skobic had duties to disclose these material facts (*see supra* ¶¶ 8, 72, 81, 83–87, 135–49, 152–63).

    a.   Joanne Skobic had a duty deriving from Electric Boat Specification 2678, and the notice she received of it, to disclose any malpractice, fraud, or falsification of parts or part documentation of which she was aware or had reason to suspect.

    b.   Joanne Skobic had a duty, by virtue of serving as an inspector on parts intended for Electric Boat, to accurately complete first piece inspection forms, to disclose nonconformances of which she was aware, and to provide full, truthful, and nonmisleading information concerning the parts she certified to Electric Boat.

c.  Joanne Skobic had a duty arising from her designation of parts on first piece inspection forms as "SAT," which was fraudulently misleading given the nonconformances, malpractice, fraud, and falsification of which she was aware.

d.  Joanne Skobic had a duty arising from her superior knowledge of Nuflo's reliance on "fraudulently-certified inspectors," FCA Am. Compl. ¶ 125; FCA SAC ¶¶ 251–52, 254, of altered heat treatment numbers; and of improper, nonconforming, unauthorized, and undocumented weld-repairs.  Electric Boat could not have obtained this knowledge through the exercise of due diligence.

191.  Joanne Skobic intentionally disregarded these duties knowing and intending that her concealment and nondisclosure of material facts would induce Electric Boat to act by accepting parts from Nuflo and SFS.  In particular, she knew that, if Electric Boat had known the facts that she concealed and failed to disclose, Electric Boat either would reject the parts or would require, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs, and that any altered heat treatment numbers be corrected (*see supra* ¶¶ 9, 62–87, 135–50, 152–54, 172–77).

192.  Electric Boat detrimentally relied on the fraudulent concealment by accepting parts from Nuflo and SFS.  If Electric Boat had known the material facts

that Joanne Skobic failed to disclose, Electric Boat either would not have accepted parts from Nuflo and SFS or Electric Boat would have required, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs, and that any altered heat treatment numbers be corrected (*see supra* ¶¶ 62–68, 172–77).

193.   Electric Boat has suffered damages due to this fraudulent concealment, including the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of Joanne Skobic's fraudulent concealment, were improperly inspected and documented and falsely certified (*see supra* ¶¶ 172–77).

## COUNT III

### Civil Conspiracy To Commit Fraud (Against Mickey Skobic And Joanne Skobic)

194.   Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 1–4, 6–8, and 10–35 above.

195.   Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed with one another and among themselves to defraud Electric Boat out of money and property by conducting nonconforming, unauthorized, and undocumented weld-repairs on parts; by altering heat treatment numbers; by failing to perform required inspection and testing; by relying on unqualified personnel, improper inspections, and fraudulently-certified inspectors; and by then falsely certifying that

nonconforming Nuflo parts had "been manufactured in accordance with all applicable specifications and purchase order requirements," that the test results included in the certification packages "represent the actual attributes of the items furnished . . . and are in full compliance with all specification and order requirements," and that any weld-repairs had been documented and were described in the certification package. In some instances, these individuals made these false certifications as to parts sold to Electric Boat via SFS (*see supra* ¶¶ 39–61, 69–151).

196. Mickey Skobic repeatedly committed overt acts in furtherance of this conspiracy. He knowingly conducted improper, nonconforming, unauthorized, and undocumented weld-repairs. In addition, he completed and signed LPT inspection reports designating parts as "ACCEPT" even though he knew the parts were nonconforming because they had been weld-repaired absent the required preapproval from Electric Boat and because the weld-repairs had not been documented. Mickey Skobic did all of this despite knowing the parts were destined for Electric Boat and would be certified as conforming even though—due to his intentional, fraudulent conduct—they were not conforming and contained unauthorized and undocumented weld-repairs (*see supra* ¶¶ 69–86, 90, 92–134).

197. Joanne Skobic repeatedly committed overt acts in furtherance of this conspiracy. She acted as a "fraudulently-certified inspector[]" who performed "various quality inspections" "although not properly certified" to do so, including

"verification of material composition, heat treatment, and critical dimensional checks." FCA Am. Compl. ¶¶ 13, 125; FCA SAC ¶¶ 20, 251–52, 254. Joanne Skobic also included false information—namely, altered heat treatment numbers— in first piece inspection forms she completed and initialed, and fraudulently designated parts as "SAT" as to "Visual," "Visual and Dimensional," and "Marking" despite knowing of Nuflo's reliance on fraudulently-certified inspectors, altered heat treatment numbers, and unauthorized and undocumented weld-repairs. Joanne Skobic also herself intentionally changed heat treatment numbers on parts "without verifying the conformance of the material," thus "destroying accurate traceability," and/or knew about such intentional conduct by other Co-Conspirators. FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40. Joanne Skobic did all of this despite knowing that the parts were destined for Electric Boat and would be certified as conforming even though—due to her intentional, fraudulent conduct—they were not conforming and contained unauthorized and undocumented weld-repairs, had been inspected by unqualified inspectors, or had altered heat treatment numbers (*see supra* ¶¶ 5, 56– 60, 69–70, 135–50, 152–54).

198.  SFS facilitated these and similar false certifications by entering into contracts with Electric Boat, knowingly receiving nonconforming parts from Nuflo, and then routing those nonconforming parts to Electric Boat alongside "false

certification[s]," Orig. FCA Compl. ¶¶ 70, 72–73, the Skobics allege SFS knowingly made (*see supra* ¶¶ 75, 88–91, 100–08).

199.   The certifications that Mickey Skobic and Joanne Skobic conspired to make were knowingly false statements concerning material facts—namely, that Nuflo's parts had "been manufactured in accordance with all applicable specifications and purchase order requirements," that the test results included in the certification packages "represent the actual attributes of the items furnished . . . and are in full compliance with all specification and order requirements," and that any weld-repairs had been documented and were described in the certification package (*see supra* ¶¶ 39–48, 62–151).

200.   Mickey Skobic, Joanne Skobic, and the Co-Conspirators intended that Electric Boat would rely on these false certifications by accepting parts from Nuflo and SFS.  In particular, they knew that, if the certifications had disclosed that parts contained unauthorized and undocumented weld-repairs, had been inspected by unqualified inspectors, or had altered heat treatment numbers, Electric Boat either would reject the parts or would require, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs, and that any altered heat treatment numbers be corrected (*see supra* ¶¶ 62–87, 150, 172–77).

201.   When Mickey Skobic, Joanne Skobic, and the Co-Conspirators conducted nonconforming, unauthorized, and undocumented weld-repairs on parts, falsified heat treatment numbers and thus "destroy[ed] accurate traceability," FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40, failed to perform required inspection and testing, and relied on unqualified personnel, improper inspections, and fraudulently-certified inspectors, they frustrated the operation of Electric Boat's quality-assurance program (*see supra* ¶¶ 62–68, 87, 150, 172–77).

202.   In particular, Electric Boat detrimentally relied on the foregoing false certifications by accepting parts from Nuflo and SFS.  If the certifications had been accurate, Electric Boat either would not have accepted parts from Nuflo and SFS or Electric Boat would have required, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs, and that any altered heat treatment numbers be corrected (*see supra* ¶¶ 62–68, 172–77).

203.   In agreeing to and committing overt acts in furtherance of this conspiracy, Mickey and Joanne Skobic acted to personally benefit themselves. Specifically, Mickey and Joanne Skobic acted to manufacture an FCA lawsuit against Nuflo, Electric Boat, and NNS and thereby advance their personal stake in the fraud and misconduct separate from their duties as Nuflo employees (*see supra* ¶¶ 8, 164–70).

204.   Electric Boat has suffered damages due to the Skobics' fraud, including the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that the Skobics allege they conspired to improperly repair, destroy traceability, and falsely certify (*see supra* ¶¶ 172–77).

## COUNT IV

**Aiding And Abetting Fraud (Against Mickey Skobic And Joanne Skobic)**

205.   Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 1–4, 7–8, and 10–35 above.

206.   According to the Skobics, several individuals—whom the Skobics identify as including John Licausi, Ryan Licausi, Steve Cefalu, and Chris Moore—sought to defraud Electric Boat out of money and property by conducting nonconforming, unauthorized, and undocumented weld-repairs on parts; by altering heat treatment numbers; by failing to perform required inspection and testing; by relying on unqualified personnel, improper inspections, and fraudulently-certified inspectors; and by then falsely certifying that nonconforming Nuflo parts had "been manufactured in accordance with all applicable specifications and purchase order requirements," that the test results included in the certification packages "represent the actual attributes of the items furnished . . . and are in full compliance with all specification and order requirements," and that any weld-repairs had been documented and were described in the certification package.  In some instances,

these individuals made these false certifications as to parts sold to Electric Boat via SFS (*see supra* ¶¶ 39–61, 69–151).

207.   Mickey Skobic knew of these individuals' frauds on Electric Boat and played an integral role in those frauds (*see supra* ¶¶ 69–87, 92–134).

208.   Mickey Skobic provided substantial assistance to advance the commission of these frauds by knowingly conducting improper, nonconforming, and unauthorized weld-repairs.  In addition, Mickey Skobic completed and signed LPT inspection reports designating parts as "ACCEPT" even though he knew that the parts were nonconforming because they had been weld-repaired absent the required preapproval from Electric Boat and because the weld-repairs had not been properly documented.  Mickey Skobic did all of this despite knowing that the parts were destined for Electric Boat and that the Licausis, Cefalu, and/or Moore, who according to the Skobics asked Mickey Skobic to perform the nonconforming repairs, would certify the parts as conforming even though—due to Mickey Skobic's intentional and substantial assistance—the parts were not conforming (*see supra* ¶¶ 69–87, 90, 92–134).

209.   Joanne Skobic knew of these individuals' repeated frauds on Electric Boat and played an integral role in those frauds (*see supra* ¶¶ 69–87, 135–50, 152–53).

210.   Joanne Skobic provided substantial assistance to advance the commission of these frauds. According to the Skobics, "Nuflo management" (which included the Licausis, Cefalu, and Moore) "routinely instructed . . . quality inspectors to change heat-lot numbers on parts to reflect conformity to requirements," and Joanne Skobic was one of the quality inspectors who carried out those instructions, thereby "destroying accurate traceability," and/or had contemporaneous knowledge of other inspectors doing so. FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40. Joanne Skobic also conducted dimensional and tolerance inspections, fraudulently designating parts in first piece inspection forms as "SAT" as to "Visual," "Visual and Dimensional," and "Marking" despite knowing that she was "not properly certified" to conduct such inspections, that heat treatment numbers had been altered, and that unauthorized and undocumented weld-repairs had been conducted. FCA Am. Compl. ¶ 13; FCA SAC ¶ 20. The Skobics admit that Joanne Skobic provided this substantial assistance despite knowing the parts were destined for Electric Boat and that the Licausis, Cefalu, and/or Moore would certify the parts as conforming even though—due to Joanne Skobic's intentional and substantial assistance—the parts were not conforming (*see supra* ¶¶ 5–6, 69–72, 74, 83, 135–50, 152–54).

211.   SFS facilitated these false certifications by entering into contracts with Electric Boat, knowingly receiving nonconforming parts from Nuflo, and then

routing those nonconforming parts to Electric Boat alongside "false certification[s]," Orig. FCA Compl. ¶¶ 70, 72–73, that the Skobics allege SFS knowingly made (*see supra* ¶¶ 75, 88–91, 100–108).

212.    The certifications to which Mickey Skobic and Joanne Skobic provided substantial assistance were knowingly false statements concerning material facts— namely, that Nuflo's parts had "been manufactured in accordance with all applicable specifications and purchase order requirements," that the test results included in the certification packages "represent the actual attributes of the items furnished . . . and are in full compliance with all specification and order requirements," and that any weld-repairs had been documented and were described in the certification package (*see supra* ¶¶ 39–48, 62–151).

213.    The individuals who completed these certifications intended that Electric Boat would rely on these false certifications by accepting parts from Nuflo and SFS.  In particular, they knew that, if the certifications had disclosed that parts contained unauthorized and undocumented weld-repairs, Electric Boat either would reject the parts or would require, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs (*see supra* ¶¶ 62–87, 92–134).

214.    The fraud frustrated the operation of Electric Boat's quality-assurance program (*see supra* ¶¶ 62–68, 172–77, 201).

215.   In particular, Electric Boat detrimentally relied on the foregoing false certifications by accepting parts from Nuflo and SFS.  If the certifications had been accurate, Electric Boat either would not have accepted parts from Nuflo and SFS or Electric Boat would have required, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs, and that any altered heat treatment numbers be corrected (*see supra* ¶¶ 62–68, 172–77).

216.   In aiding and abetting the fraud, Mickey and Joanne Skobic acted to personally benefit themselves.  Specifically, Mickey and Joanne Skobic did so to manufacture an FCA lawsuit against Nuflo, Electric Boat, and NNS and thereby advance their personal stake in the fraud and misconduct separate from their duties as Nuflo employees (*see supra* ¶¶ 9, 164–70).

217. Electric Boat has suffered damages due to the Skobics' frauds, including the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of these frauds, were improperly repaired and falsely certified (*see supra* ¶¶ 172–77).

## COUNT V

**Civil Remedies For Violation And Conspiracy In Violation Of The Federal RICO Act (Against Mickey Skobic, For Both Violation And Conspiracy, And Joanne Skobic, For Conspiracy Only)**

218.   Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 10–42 and 49–60 above.

219.   The federal RICO Act, 18 U.S.C. § 1962 & § 1964, provides a private right of action for plaintiffs to recover against defendants who harm them by conducting an enterprise through a pattern of racketeering activity, as well as defendants who conspire to do so.

### A. *Conduct Of Enterprise In Violation Of 18 U.S.C. § 1962(c)—Nuflo Enterprise*

220.   Nuflo was an enterprise engaged in and whose activities affect interstate commerce (*see supra* ¶¶ 2–3, 33–35, 172–77).

221.   Mickey Skobic agreed to and did conduct and participate in the conduct of Nuflo's affairs through a pattern of racketeering activity (*see supra* ¶¶ 4, 6–8, 69–134).

222.   According to the Skobics, Mickey Skobic participated with a small group—including Joanne Skobic, John Licausi, Ryan Licausi, Steve Cefalu, Chris Moore, and Tommy Connor—in operating Nuflo as a criminal enterprise (*see supra* ¶¶ 4, 6–8, 69–150).

223.   In lieu of attempting to satisfy Nuflo's contractual obligations, Mickey Skobic and these individuals decided to engage in "at least the following categories of" misconduct: "(1) undocumented and unauthorized weld repairs to falsify conformances; (2) falsified heat treat[ment] numbers; (3) failure to perform required inspection and testing; (4) unqualified personnel and improper inspections; and (5) falsification of records" (*see supra* ¶¶ 4, 6–8, 69–151).  FCA Am. Compl. ¶ 95; FCA SAC ¶¶ 8, 107, 210, 240.

224.   Mickey Skobic was integral to the conduct of Nuflo's criminal affairs (*see supra* ¶¶ 73–134), including:

    a.  Mickey Skobic was principally responsible for carrying out undocumented and unauthorized weld-repairs.

    b.  Mickey Skobic falsified records by failing to disclose weld-repairs when required to do so.

    c.  Mickey Skobic determined how to "disguise" weld-repairs he conducted.  FCA Am. Compl. ¶ 101; FCA SAC ¶ 212.

    d.  Mickey Skobic decided whether and how to conduct LPT testing required to be performed on weld-repairs and whether to sign LPT inspection reports designating as "ACCEPT" parts he knew were nonconforming.

    e.   Mickey Skobic was "personally aware" of "the improper policies and practices of . . . Nuflo," as well as "Nuflo's relationship with SFS," which the Skobics allege the Co-Conspirators used to facilitate "the false certification that [Nuflo] products conform to contractual specifications," including as to parts Mickey Skobic welded personally.  Orig. FCA Compl. ¶¶ 19, 72.

225.   Steve Cefalu was integral to the conduct of Nuflo's criminal affairs by serving as a Nuflo quality manager yet directing the performance of unauthorized and undocumented weld-repairs and repeatedly and knowingly falsely certifying to Electric Boat that nonconforming parts—which had been subjected to unauthorized and undocumented weld-repairs—were conforming (*see supra* ¶¶ 73–123).  FCA Am. Compl. ¶¶ 99, 207–08; FCA SAC ¶¶ 214, 226.

### B.  *Conduct Of Enterprise In Violation Of 18 U.S.C. § 1962(c)—Alternative Enterprise*

226.   Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed to and did form an enterprise (the "Alternative Enterprise"), and associated together for a common purpose of engaging in a course of conduct, namely inducing Electric Boat and NNS to accept and pay for nonconforming parts (*see supra* ¶¶ 3–7, 68–152). The activities of the Alternative Enterprise affected interstate commerce (*see supra* ¶¶ 1–3, 33–35, 172–77).

227. The Alternative Enterprise existed separately and independently from the pattern of racketeering activity in which it engaged.

228. Nuflo welders, including Mickey Skobic, intentionally "perform[ed] unapproved and nearly always undocumented weld repairs," knowing that their conduct was "illegal[]" and rendered parts nonconforming to the specifications established by the Navy and by Electric Boat via its purchase orders. FCA Am. Compl. ¶¶ 96–97, 115; FCA SAC ¶¶ 203, 210, 226. In doing so, Mickey Skobic determined how to "disguise" the parts he weld-repaired. FCA Am. Compl. ¶ 101; FCA SAC ¶ 212. In addition, Mickey Skobic completed and signed LPT inspection reports designating parts as "ACCEPT" even though he knew that the parts were nonconforming because they had been weld-repaired absent the required preapproval from Electric Boat and the weld-repairs had not been properly documented (*see supra* ¶¶ 4, 6, 69–134).

229. Nuflo "quality inspectors . . . change[d] heat-lot numbers on parts to reflect conformity to requirements without verifying the conformance of the material . . . and without documenting the changed number, thus destroying accurate traceability for the product." FCA Am. Compl. ¶ 120; FCA SAC ¶¶ 239–40. In addition, Joanne Skobic conducted dimensional and tolerance inspections, fraudulently designating parts in first piece inspection forms as "SAT" as to "Visual," "Visual and Dimensional," and "Marking" despite knowing that she was

"not properly certified" to conduct such inspections and that the heat treatment numbers had been altered.  FCA Am. Compl ¶ 13; FCA SAC ¶ 20.  Joanne Skobic did so and/or had contemporaneous knowledge of other inspectors doing so, yet never reported this misconduct to Electric Boat or the Navy, despite her obligation to do so (*see supra* ¶¶ 5–6, 135–50).

230.   John Licausi, Ryan Licausi, Steve Cefalu, Chris Moore, and Tommy Connor repeatedly signed statements in certification packages attesting that the parts "have been manufactured in accordance with all applicable specification and purchase order requirements" and that the included test reports "represent the actual attributes of the items furnished on the order and that the test results are in full compliance with all specification and order requirements," and according to the Skobics, these individuals did so while knowing that the parts were not conforming and the test results were not compliant (*see supra* ¶¶ 43–48, 73–87, 92–134).

231.   SFS facilitated these and similar false certifications by entering into contracts with Electric Boat, receiving nonconforming parts from Nuflo, and then routing those nonconforming parts to Electric Boat with "false certification[s]," Orig. FCA Compl. ¶¶ 70, 72–73, that SFS knowingly made (*see supra* ¶¶ 75, 88–91, 100–08).

232.   The associates of the Alternative Enterprise had relationships with and among each other in carrying out the operations of the enterprise (*see supra* ¶¶ 69–153).

233.   From at least 2005 through 2014, FCA Am. Compl. ¶¶ 13, 92, 96; FCA SAC ¶¶ 20, 203, the Alternative Enterprise functioned as a continuing unit, which was long enough to permit the Alternative Enterprise's associates to pursue its purpose, namely inducing Electric Boat and NNS to accept and pay for nonconforming parts (*see supra* ¶¶ 4, 73–153).

234.   According to the Skobics, Mickey Skobic participated with a small group—the Co-Conspirators, including Joanne Skobic, John Licausi, Ryan Licausi, Steve Cefalu, Chris Moore, and Tommy Connor—in operating the Alternative Enterprise as a criminal enterprise (*see supra* ¶¶ 4, 6–9, 69–153).

235.   Mickey Skobic was integral to the conduct of the criminal affairs of this associated-in-fact enterprise (*see supra* ¶¶ 73–134, 224).

236.   Steve Cefalu was integral to the conduct of the criminal affairs of this associated-in-fact enterprise (*see supra* ¶¶ 73–123, 225).

### C.   *Predicate Acts Of Mail Fraud, 18 U.S.C. § 1341*

237.   In pursuit of this scheme, and intending to defraud Electric Boat, Mickey Skobic willingly committed multiple related acts of racketeering activity—namely, mail fraud.  Specifically, Mickey Skobic improperly welded parts that he

knew would be falsely certified to Electric Boat as conforming.  He also completed fraudulent LPT inspection reports that designated the parts as "ACCEPT" even though he knew the parts were nonconforming because they contained unauthorized, undocumented, and undisclosed weld-repairs.  Mickey Skobic did all this even though he knew and intended that the parts would be (as they in fact were) falsely certified as conforming in certification packages mailed to Electric Boat, in order to defraud Electric Boat out of money and property.  18 U.S.C. § 1964; 18 U.S.C. § 1961(1); 18 U.S.C. § 1341.  Examples of these acts of mail fraud include the following (*see supra* ¶¶ 73–134):

    a. As one example (*see supra* ¶¶ 93–99), in August 2013 Mickey Skobic performed improper, nonconforming, unauthorized, and undocumented weld-repairs on nine 6-inch elbows to disguise nonconforming cracks on these parts, knowing that the purchase order prohibited this weld-repair absent approval from Electric Boat; that such approval had not been obtained; and that the elbows would be falsely certified as conforming.  *See* FCA Am. Compl. ¶ 242; *accord* FCA SAC, App'x B at B-1.

    b. The certification package was shipped from Nuflo's facility in Florida and arrived at Electric Boat's Quonset Point, Rhode Island

shipyard via YRC on September 20, 2013, and it falsely stated that the parts conformed to NAVSEA and Electric Boat specifications.

c.   As a second example (*see supra* ¶¶ 100–08), in October 2011 Mickey Skobic performed improper, nonconforming, unauthorized, and undocumented weld-repairs on a 10-inch carbon steel elbow to disguise a nonconforming "3 [inch] long" crack, FCA Am. Compl. ¶ 233; *accord* FCA SAC, App'x B at B-1, knowing that the purchase order prohibited this weld-repair absent approval from Electric Boat; that such approval had not been obtained; and that the elbow would be falsely certified as conforming, *see* FCA Am. Compl. ¶¶ 233–34.

d.   The certification package was shipped from Nuflo's facility in Florida to SFS's facility in Virginia on April 18, 2012 and was subsequently shipped to Electric Boat's Quonset Point, Rhode Island shipyard on May 23, 2012 via YRC, and it falsely stated that the part conformed to NAVSEA and Electric Boat specifications.

e.   As a third example (*see supra* ¶¶ 109–115), in September and October 2009, Mickey Skobic performed improper, nonconforming, unauthorized, and undocumented weld-repairs on several 8-inch elbows, knowing that the purchase order prohibited this weld-repair

69

absent approval from Electric Boat; that such approval had not been obtained; and that the elbows would be falsely certified as conforming.  *See id.* ¶¶ 221–24; *accord* FCA SAC, App'x B at B-1.

f.   The certification package was shipped from Nuflo's facility in Florida, arrived at Electric Boat's Quonset Point, Rhode Island shipyard via UPS on or about October 14, 2009, and it falsely stated that the parts conformed to NAVSEA and Electric Boat specifications.

g.   As a fourth example (*see supra* ¶¶ 116–123), in June 2009, Mickey Skobic performed improper, nonconforming, unauthorized, and improperly documented weld-repairs on three 6-inch elbows, knowing that the purchase order prohibited this weld-repair absent approval from Electric Boat; that such approval had not been obtained; and that the elbows would be falsely certified as conforming.  *See* FCA Am. Compl. ¶ 212–13; *accord* FCA SAC, App'x B at B-1.

h.   The certification package was shipped from Nuflo's facility in Florida, arrived at Electric Boat's Quonset Point, Rhode Island shipyard via UPS on October 13, 2009, and it falsely stated that the parts conformed to NAVSEA and Electric Boat specifications.

    i.    As a fifth example (*see supra* ¶¶ 124–34), on February 24, 2012, Mickey Skobic completed and signed an LPT inspection report for nine parts which he knew had been weld-repaired absent the required preapproval from Electric Boat and which had not been properly documented, knowing that those parts would be falsely certified as conforming.

    j.    The certification package was shipped from Nuflo's facility in Florida, arrived at Electric Boat's Quonset Point, Rhode Island shipyard via YRC on April 3, 2012, and it falsely stated that the parts conformed to NAVSEA and Electric Boat specifications.

238.   Steve Cefalu willingly committed multiple related acts of racketeering activity—namely, mail fraud—by knowingly signing false certifications representing parts as conforming even though he knew the parts were nonconforming because they contained unauthorized, undocumented, and undisclosed weld-repairs, and when he knew and intended that those false certifications would be (as they in fact were) mailed to Electric Boat, in order to defraud Electric Boat out of money and property (*see supra* ¶¶ 73–90, 92–123).

239.   It was reasonably foreseeable that a commercial interstate mail carrier would be used in the execution of this scheme (*see supra* ¶¶ 61, 87, 99, 108, 115, 122, 134).

240.   The fraudulent statements contained in and represented by those mailed certification packages misled Electric Boat by frustrating the operation of Electric Boat's quality-assurance program.  In particular, Electric Boat detrimentally relied on the foregoing false certifications by accepting parts from Nuflo and SFS.  If the certifications that Mickey Skobic and Steve Cefalu falsely completed, directed, and/or conspired with others to make—and which Mickey Skobic and Steve Cefalu caused to be mailed to Electric Boat—had been accurate, Electric Boat either would not have accepted parts from Nuflo and SFS or Electric Boat would have required, before accepting the parts, that the parts be reinspected by qualified inspectors using specialized procedures designed to detect and assess weld-repairs (*see supra* ¶¶ 62–68, 172–77).

241.   Via these repeated frauds, Mickey Skobic sought to and did benefit by, among other things, inducing Electric Boat to pay for nonconforming parts—payments which flowed, in part, to Mickey Skobic (and Joanne Skobic) in the form of salary and continued employment—and by continuing to develop the FCA complaint the Skobics intended to file against Nuflo, Electric Boat, and NNS (*see supra* ¶¶ 9, 62–68, 164–70).

242.   Via these repeated frauds, Steve Cefalu sought to and did benefit by, among other things, inducing Electric Boat to pay for nonconforming parts—

payments which flowed, in part, to Steve Cefalu in the form of salary and continued employment (*see supra* ¶¶ 62–68, 73–87).

### D.  Pattern Of Racketeering Activity

243.   These examples, together with the "thousands" of similar instances the Skobics have admitted to in their FCA Amended Complaints, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  FCA Am. Compl. ¶ 108; FCA SAC ¶ 224.

244.   This racketeering activity exhibited continuity (*see supra* ¶¶ 4–8, 69–151) in that the Skobics have admitted that:

a.  These predicate acts were committed over a number of years, beginning in 2005 and continuing at least through 2014;

b.  These predicate acts were a regular way of doing business over the period;

c.  Similar predicate acts were directed at both Electric Boat and NNS;

d.  These predicate acts of mail fraud were one part of multiple related schemes that included "undocumented and unauthorized weld repairs," "[f]ailure to perform required . . . testing," "falsified heat treat numbers," "falsification of records," and "improper inspections," including the conduct of both Mickey and Joanne Skobic.  FCA Am. Compl. ¶ 95; FCA SAC ¶¶ 107, 210, 240.

### E. *Conspiracy In Violation Of 18 U.S.C. § 1962(d)*

245.    Further, Mickey Skobic and Joanne Skobic both conspired and agreed, in violation of 18 U.S.C. § 1962(d), to facilitate the operation of the Nuflo Enterprise and/or the Alternative Enterprise through a pattern of racketeering and by agreeing to the commission of multiple predicate acts with one another and the Co-Conspirators in order to defraud Electric Boat out of money and property (*see supra* ¶¶ 69–153).

246.    In doing so, Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed to an overall objective—namely the aforementioned scheme to defraud Electric Boat out of money and property by inducing it to accept nonconforming Nuflo parts (*see supra* ¶¶ 69–91, 135–51).

247.    This agreement is manifest, among other things, in Mickey Skobic's agreement with the Co-Conspirators to conduct nonconforming welds over a period of eight years; Joanne Skobic's agreement with the Co-Conspirators to serve as a fraudulently-certified inspector and to falsify heat treatment numbers; Mickey and Joanne Skobic's agreement to complete and sign or initial fraudulent LPT and first piece inspection reports, respectively; the fact of Mickey and Joanne Skobic's marriage, as well as the "personal[] aware[ness]" of both Mickey and Joanne Skobic of the "improper policies and practices" that each of them furthered at Nuflo and of

Nuflo's "relationship with SFS" and SFS's facilitation of false certifications (*see supra* ¶¶ 14–16, 69–153).  Orig. FCA Compl. ¶¶ 19, 72.

248.  By each of the predicate acts of mail fraud described above in Paragraphs 237 and 239–41, Mickey Skobic committed an overt act in furtherance of this conspiracy.

249.  By each of the predicate acts of mail fraud described above in Paragraphs 237–40 and 242 (except for the act described in subparagraphs (i) and (j) of Paragraph 237), Steve Cefalu committed an overt act in furtherance of this conspiracy.

### F. Direct Injury To Electric Boat Due To The Skobics' Racketeering And Conspiracy

250.  As a direct result of the pattern of racketeering activity and conspiracy alleged above, Electric Boat suffered injuries to its business and/or property, including, among other things, the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of the racketeering activity and conspiracy, were improperly repaired and falsely certified (*see supra* ¶¶ 62–68, 172–77).

## COUNT VI

**Civil Remedies For Violation And Conspiracy In Violation Of The Florida Civil Remedies For Criminal Practices Act (Against Mickey Skobic, For Both Violation And Conspiracy, And Joanne Skobic, For Conspiracy Only)**

251. Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 10–32 and 39–61 above.

252. The Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Ann. § 772.103(3)–(4) & § 772.104, provides a private right of action for plaintiffs to recover against defendants who harm them by conducting the affairs of an enterprise through a pattern of criminal activity.

### A. *Conduct Of Enterprise In Violation Of Fla. Stat. Ann. § 772.103(3)—Nuflo Enterprise*

253. Nuflo was an enterprise (*see supra* ¶¶ 1–3, 33–35).

254. Mickey Skobic agreed to and did conduct and participate in the conduct of Nuflo's affairs through a pattern of criminal activity (*see supra* ¶¶ 4, 6–8, 69–134).

255. According to the Skobics, Mickey Skobic participated with a small group—including Joanne Skobic, John Licausi, Ryan Licausi, Steve Cefalu, Chris Moore, and Tommy Connor—in operating Nuflo as a criminal enterprise (*see supra* ¶¶ 4, 6–8, 69–151).

256.   In lieu of attempting to satisfy Nuflo's contractual obligations, Mickey Skobic and these individuals decided to engage in the categories of misconduct alleged in Paragraph 223 above.

257.   Mickey Skobic was integral to the conduct of Nuflo's criminal affairs, as alleged in Paragraph 224 above.

258.   Steve Cefalu was integral to the conduct of Nuflo's criminal affairs, as alleged in Paragraph 225 above.

## B. Conduct Of Enterprise In Violation Of Fla. Stat. Ann. § 772.103(3)— Alternative Enterprise

259.   Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed to and did form an enterprise (the "Alternative Enterprise"), and associated together for a common purpose of engaging in a course of conduct, namely inducing Electric Boat and NNS to accept and pay for nonconforming parts (*see supra* ¶¶ 4–8, 69–153, 226–36).

260.   The Alternative Enterprise existed separately and independently from the pattern of criminal activity in which it engaged (*see supra* ¶¶ 227–32).

261.   As alleged above, the associates of the Alternative Enterprise had relationships with and among each other in carrying out the operations of the enterprise (*see supra* ¶¶ 75–152, 232).

262.   For at least several years (the Skobics admit this period included at least from 2005 through 2014, FCA Am. Compl. ¶¶ 13, 92, 96; FCA SAC ¶¶ 20,

203), the Alternative Enterprise functioned as a continuing unit, which was long enough to permit the Alternative Enterprise's associates to pursue its purpose, namely inducing Electric Boat and NNS to accept and pay for nonconforming parts (*see supra* ¶¶ 4, 73–153, 233).

263.   According to the Skobics, Mickey Skobic participated with a small group—the Co-Conspirators, including Joanne Skobic, John Licausi, Ryan Licausi, Steve Cefalu, Chris Moore, Tommy Connor, and SFS—in operating the Alternative Enterprise as a criminal enterprise (*see supra* ¶¶ 4, 6–9, 69–153, 234–36).

264.   Mickey Skobic was integral to the conduct of the criminal affairs of this associated-in-fact enterprise (*see supra* ¶¶ 73–134, 224, 235).

265.   Steve Cefalu was integral to the conduct of the criminal affairs of this associated-in-fact enterprise (*see supra* ¶¶ 73–123, 225, 236).

### C. Predicate Acts Of Mail Fraud, 18 U.S.C. § 1341

266.   In pursuit of this scheme, and intending to defraud Electric Boat, Mickey Skobic willingly committed multiple related acts of criminal activity—namely, mail fraud—as alleged above in Paragraphs 237 and 239–41.  Fla. Stat. Ann. § 772.102; 18 U.S.C. § 1961(1); 18 U.S.C. § 1341.

267.   Via the Skobics' repeated frauds, Mickey Skobic sought to and did benefit by, among other things, inducing Electric Boat to pay for nonconforming parts—payments which flowed, in part, to Mickey Skobic (and Joanne Skobic) in

the form of salary and continued employment—and by continuing to develop the FCA complaint the Skobics intended to file against Nuflo, Electric Boat, and NNS (*see supra* ¶¶ 9, 62–68, 164–70, 241).

268.    In pursuit of this scheme, and intending to defraud Electric Boat, Steve Cefalu willingly committed multiple related acts of criminal activity—namely, mail fraud—as alleged above in Paragraphs 237–40 and 242 (except for the act described in subparagraphs (i) and (j) of Paragraph 237). Fla. Stat. Ann. § 772.102; 18 U.S.C. § 1961(1); 18 U.S.C. § 1341.

269.    Via the repeated frauds the Skobics have admitted, Steve Cefalu sought to and did benefit by, among other things, inducing Electric Boat to pay for nonconforming parts—payments which flowed, in part, to Steve Cefalu in the form of salary and continued employment (*see supra* ¶¶ 62–68, 73–87, 242).

### D. Pattern Of Racketeering Activity

270.    The above-alleged examples, together with the "thousands" of similar instances the Skobics have alleged in the FCA Amended Complaints, constitute a pattern of criminal activity pursuant to Fla. Stat. Ann. § 772.102(4). FCA Am. Compl. ¶ 108; FCA SAC ¶¶ 11, 235.

271.    This criminal activity exhibited continuity (*see supra* ¶¶ 4–8, 69–151, 244).

### E. *Conspiracy In Violation Of Fla. Stat. Ann. § 772.103(4)*

272.   Further, Mickey Skobic and Joanne Skobic each conspired and agreed, in violation of Fla. Stat. Ann. § 772.103(4), to facilitate the operation of the Nuflo Enterprise and/or the Alternative Enterprise through a pattern of criminal activity and by agreeing to the commission of multiple predicate acts with one another and the Co-Conspirators in order to defraud Electric Boat (*see supra* ¶¶ 69–153, 245, 247).

273.   In doing so, Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed to an overall objective—namely the aforementioned scheme to defraud Electric Boat out of money and property by inducing it to accept nonconforming Nuflo parts (*see supra* ¶¶ 69–91, 135–51).

274.   By each of the predicate acts of mail fraud described above in Paragraphs 237 and 239–41, Mickey Skobic committed an overt act in furtherance of this conspiracy.

275.   By each of the predicate acts of mail fraud described above in Paragraphs 237–40 and 242 (except for the act described in subparagraphs (i) and (j) of Paragraph 237), Steve Cefalu committed an overt act in furtherance of this conspiracy.

### F. *Direct Injury To Electric Boat Due To The Skobics' Criminal Activity And Conspiracy*

276.   As a direct result of the pattern of criminal activity and conspiracy alleged above, Electric Boat suffered injuries to its business and/or property (*see supra* ¶¶ 172–77, 250).

### <u>COUNT VII</u>

### Tortious Interference And Conspiracy To Tortiously Interfere With Contract (Against Mickey Skobic And Joanne Skobic)

277.   Electric Boat realleges and incorporates by reference the Paragraphs of this Complaint cited in this Count, as well as Paragraphs 2–3, 5–8, 10–30, 32–35, and 39–61 above.

278.   At all times relevant to this complaint, Electric Boat had a contractual and business relationship with the Navy for the construction of Virginia-class nuclear submarines (*see supra* ¶¶ 1, 4, 31).

279.   Mickey Skobic knew of the contractual and business relationship between Electric Boat and the Navy (*see supra* ¶¶ 1, 4, 164–70).

280.   Mickey Skobic intentionally and without justification interfered with Electric Boat's contractual and business relationship with the Navy using improper means, including by knowingly conducting improper, nonconforming, unauthorized, and undocumented weld-repairs, and by failing to disclose such weld-repairs, including when he completed and signed LPT inspection reports, on parts that he

knew would be falsely certified to Electric Boat as conforming and that were intended to be used by Electric Boat in the performance of Electric Boat's contracts with the Navy (*see supra* ¶¶ 69–134).

281. Joanne Skobic knew of the contractual and business relationship between Electric Boat and the Navy (*see supra* ¶¶ 1, 4, 164–70).

282. Joanne Skobic intentionally and without justification interfered with Electric Boat's contractual and business relationship with the Navy using improper means, including by performing inspections when not qualified to do so, and by changing heat treatment numbers on parts without documenting those changes, thereby "destroying accurate traceability," on parts that she knew would be falsely certified to Electric Boat as conforming and that were intended to be used by Electric Boat in the performance of Electric Boat's contracts with the Navy (*see supra* ¶¶ 69–87, 135–50, 152–53).

283. The tortious conduct of Mickey and Joanne Skobic interfered with Electric Boat's contractual and business relationship with the Navy by disrupting Electric Boat's performance of its contracts and by rendering Electric Boat's performance more expensive and burdensome (*see supra* ¶¶ 62–68, 172–77).

284. Further, Mickey Skobic and Joanne Skobic conspired and agreed with one another and with the Co-Conspirators—all of whom knew of the contractual and

business relationship between Electric Boat and the Navy—to tortiously interfere with Electric Boat's contracts with the Navy (*see supra* ¶¶ 69–153).

285.    In particular, Mickey Skobic, Joanne Skobic, and the Co-Conspirators agreed with one another and among themselves to intentionally and without justification interfere with the contractual and business relationship between Electric Boat and the Navy using improper means, including by conducting nonconforming, unauthorized, and undocumented weld-repairs on parts; by falsifying heat treatment numbers; by failing to perform required inspection and testing; and by relying on unqualified personnel, improper inspections, and "fraudulently-certified inspectors," FCA Am. Compl. ¶ 125; FCA SAC ¶¶ 251–52, 254, and by then falsely certifying that nonconforming Nuflo parts had "been manufactured in accordance with all applicable specifications and purchase order requirements," that the test results included in the certification packages "represent the actual attributes of the items furnished . . . and are in full compliance with all specification and order requirements," and that any weld-repairs had been documented and were described in the certification package, all while knowing that the parts were intended to be used by Electric Boat in the performance of Electric Boat's contracts with the Navy (*see supra* ¶¶ 69–153).

286.    Mickey Skobic repeatedly committed overt acts in furtherance of this conspiracy (*see supra* ¶¶ 69–134, 196).

287.   Joanne Skobic repeatedly committed overt acts in furtherance of this conspiracy (*see supra* ¶¶ 135–50, 152–53, 197).

288.   In agreeing to and committing overt acts in furtherance of this conspiracy, Mickey and Joanne Skobic acted to personally benefit themselves (*see supra* ¶¶ 9, 164–70).

289.   Electric Boat suffered damages as a direct result of this interference and this conspiracy to interfere, including the millions of dollars Electric Boat has expended to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of the conspiracy, were improperly repaired and falsely certified (*see supra* ¶¶ 172–77).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Electric Boat respectfully requests that this Court enter judgment in its favor on each Count against Defendants Mickey and Joanne Skobic and grant the following relief:

A.      Damages in an amount to be determined at trial to compensate Electric Boat for injuries it suffered, including the millions of dollars Electric Boat had to expend to identify, segregate, re-test, and otherwise address those Nuflo parts that, as a result of the tortious conduct of Mickey and Joanne Skobic, were improperly repaired and falsely certified;

B.      Damages arising from the Skobics' violations of the federal RICO Act, including threefold the damages Electric Boat sustained, 18 U.S.C. § 1964(c);

C.      Damages arising from the Skobics' violations of the Florida Civil Remedies for Criminal Practices Act, including threefold the damages Electric Boat sustained, Fla. Stat. Ann. § 772.104(1);

D.      Punitive damages for the fraud and tortious interference counts;

E.      All costs and attorneys' fees incurred in the prosecution of this action; and

F.      All other legal and equitable relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Electric Boat respectfully demands a trial by jury on all triable matters.

Respectfully submitted,

/s/ Gregory W. Kehoe
(*Lead Counsel*)

Gregory W. Kehoe
Florida Bar No. 0486140
Greenberg Traurig, P.A.
101 East Kennedy Blvd.
Suite 1900
Tampa, Florida 33602
(813) 318-5732
kehoeg@gtlaw.com

Michael A. Doornweerd (*pro hac vice* to be filed)
Caroline L. Meneau (*pro hac vice* to be filed)
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2631
mdoornweerd@jenner.com
cmeneau@jenner.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2024, I caused to be electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

Dated: April 19, 2024

Respectfully Submitted,

<u>/s/ Gregory W. Kehoe</u>
   Attorney